Case number 23-5189, Al Puente et al, the balance versus United States Army Corps of Engineers et al. Ms. Jeffers for the balance, Mr. McCardell for the appellees. Good morning, Ms. Jeffers. Good morning, your honors, and may it please the court. Emily Jeffers representing Appellant Community and Environmental Groups. I'd like to reserve two minutes of my time for rebuttal. That's fine, and if I may request if you could start with the appellate jurisdictional issue that we... Yes, before I get into the merits, I'd like... I will try to be sure to give you time to talk about merits, but if you could start there, I'd be grateful. Thank you, your honor. Last Thursday, the parties filed a corrected stipulation of dismissal, this time with prejudice, for counts three and nine of the complaint, which should address any concerns regarding piecemeal appeal and consistent with this court's holdings in Robinson Reeder and Blue are sufficient to permit appeal of this case. Appellants never intended to pursue those claims further. I'm sorry, are you saying that just filing that stipulation without the court actually entering the judgment is sufficient for us to take appellate jurisdiction? That's our position. And what's your authority for that? Well, both Robinson Reeder and Blue recognize that a voluntary dismissal, voluntary stipulation of dismissal with prejudice is self-effectuating and therefore effective upon entering and is sufficient to permit appeal. I would point the court to this court statement in Blue that says, every circuit permits a plaintiff to voluntary dismiss, meaning claims, from an action as a way to conclude the district court and ready it for appeal. In order to thus produce an appealable final order, however, a voluntary dismissal typically must be made with prejudice. And here, that is exactly what we have done. While we did move from- Isn't the distinction here that you had already filed your notice of appeal and this appeal was pending when you filed your- the most recent stipulation of dismissal of prejudice, but now we've got federal rule of appellate procedure 4A2, which states a notice of appeal filed after the court announces a decision or order, but before the entry of a judgment or order, is treated as filed on the date of and after entry. So now we need the entry of an order in order for this notice of appeal to be effective. And the trial court has not ruled on your stipulation, so we don't have the entry of the order. Correct, Your Honor. So it seems to me as we sit here today, we don't have appellate jurisdiction, but if the court ruled on your stipulation and entered an order, then the notice of appeal would be deemed as of the date the court entered that order, and then we would have appellate jurisdiction. Yes, I understand- Am I not correct? I understand what you're saying, Your Honor, but it's our position that the appeal, the time frame dictated by federal rule of civil procedure 4, or appellate procedure 4, would go back to our motion to appeal the case from the corrected stipulation of dismissal, not necessarily the order of final judgment. Because the wording of the rule, rule 4, is the entry of the judgment or order. Well, Your Honor, there's nothing else to do in this case. No, I understand the practical considerations. I just think that we're bound by the rule, which says that it's treated as filed on the date of and after the entry. So it seems that your stipulation with prejudice would have to be ruled upon, the court would have to enter the judgment dismissing the prejudice, then we would have appellate jurisdiction. Well, there's, according to the precedent of this court in Robinson Reader and in Blue, a voluntary stipulation of dismissal with prejudice is sufficient to render- But that's before you filed the notice of appeal. Once you file the notice of appeal, we have to contend with rule 4, don't we? I'm sorry, are you familiar with this court's circuit precedent about appeals ripening? When a notice of appeal is filed and it's premature, and then something else happens, and it ripens? No, Judge Rogers- Notwithstanding the text that Judge Tan just cited. No, Judge Rogers, I'm not familiar with the case law that you're referring to. But it's our position that because this case is final, there's nothing left for the district court to do. And pursuant to federal law, appellate jurisdiction is limited to review of final decisions. And here, everything is finalized as a result of the stipulation and of the motion for summary judgment. And furthermore, I'd like to note that we did file the stipulation as well as move for entry of final judgment, but we did not move for entry of final judgment as a- We did not think it was necessary, but we thought just to be safe, better to be safe than sorry. But I think the stipulation of voluntary dismissal with prejudice is sufficient for this court to have jurisdiction. Can I ask you this? If we think that we need to have a court entering the judgment before we have jurisdiction, and now we're in a situation apparently where the district court is unsure that it has jurisdiction- Right, so who has jurisdiction? To enter this final judgment, is it easier for us just to dismiss this appeal, let the district court do what it needs to do, and then isn't that cleaner? And then you can just come back after that issue is resolved. I suppose it's cleaner, but I don't think it's necessary. And because the dredging in this project, in this case, begins in less than a week, I think in the interest of judicial efficiency, we should resolve the case at this level. I'm sorry. My final- Go ahead, Judge Rogers. Judge Penn's question was framed as, wouldn't it be cleaner? And my question is, from whose perspective? I mean, there are all kinds of filing fees, there are all kinds of docket entries, et cetera. So another way of doing it cleanly, if this court were to hold that we actually need an action by the district court judge, would be to wait and see what he does. He schedule it for the end of the month, be argued. I mean, that's another way of looking at it, if we think that's necessary. And of course, you know, the argument we'll hear, I'm sure, is that, well, the two cases everybody's citing, Robinson-Reeder and Blue Whale, just dictum. But I must say, in Robinson-Reeder, it's very strong dictum. Here's how to do it, counsel. Yes, exactly, Robinson-Reeder lays out, you know, here are three options for appellants, and one of them is to secure dismissal of the claim with prejudice, which we have done here. And I'd also like to note very briefly that, in any event, claims three and nine were forfeited, because we did not bring a motion for partial summary judgment at the district court level. We brought a motion for summary judgment and chose not to brief those claims, therefore forfeiting them. And when the court issued its order asking for action on those claims that we did not address, we submitted a stipulation of dismissal, which in any event was likely unnecessary, because they're already forfeited. We cannot bring them. And not only are they forfeited, they're also moot, because the claims were regarding supplementation of VBAA, which has already happened, and reinitiation under the ESA, which has already begun. I recognize that Robinson Reeder and Blue have awfully strong dicta that says a joint stipulation to dismiss remaining claims with prejudice will ready a case for appeal. But they were just dicta. And Rule 41A1A, when it talks about stipulation of dismissal signed by all parties, it talks about dismissing an action. And for that matter, A2, which is where the plaintiff requests a court order to dismiss, that also refers to an action. The action is all nine claims. And I think the most faithful reading of Rule 41A1 and Rule 41A2 would be you can't use either of those rules to get a mere claim dismissed. You can only use those rules if you want to have an entire action dismissed. Now, I recognize we have very strong dicta saying the opposite. But why should we not follow the best reading of Rule 41A1 and 2? Your Honor, as a practical matter, this is the way that claims are dismissed all the time. I know, I know. But is that a good enough reason for us to keep doing it in violation of the text of the rule? Yes, Your Honor. I believe so. I believe that that is the practice of parties. And that's what the court has recognized. Even if it's dicta, it's just so common that it's recognized as a way of dismissing a claim properly. I told you I would give you some time to talk about the merits. So please do if you'd like. Thank you, Your Honor. The project in this case will dredge 2.2 million cubic yards of material from the bottom of San Juan Bay, Puerto Rico. Has the dredging started? No, the dredging as far as we know is set to begin in five days on January 30th. And how long do you think it'll last? About a year. All right, please continue. So 2.2 million cubic yards is approximately 150,000 dump trucks. And one of the primary purposes of this dredging project is to enable large liquefied natural gas tankers, LNG tankers, to access the port. Defendants here fail to adequately consider the environmental impacts of the project. I'd like to focus my time this morning on two issues. First, the Army Corps' failure to consider the impacts of LNG development in its NEPA analysis. And second, the Fisheries Service's inadequate evaluation of impacts to threaten corals under the Endangered Species Act. First, it is undisputed that the Corps knew the dredging project would enable large LNG tankers to access the port and would result in the development of LNG infrastructure. The Corps specifically identified the need to provide LNG tankers access to San Juan Bay as a primary purpose of the project. Can you tell me where in the record it says that that was a primary purpose of the project? Because from my reading, that was not the purpose of the project. You know, Congress said, let's look at feasibility of providing navigation improvements on the harbor to increase security, safety, and efficiency. There's a 2016 review plan. It describes the purposes to determine the feasibility of widening and deepening San Juan Harbor in order to improve navigational efficiency of the harbor. And then finally, there's an integrated feasibility report. The purpose is to reduce or eliminate transportation cost inefficiencies for the petroleum product tankers and large cruise ships transiting the federal channels, the ships that are already using the harbor. Yes. So where in the record does it say that the purpose of this project is to allow LNG? At JA95 and 96, in the purpose and need statement of the environmental assessment, it specifically identifies providing LNG tankers access to San Juan Bay as one of the primary purposes of the project. Was that a purpose of the project? Where, I'm sorry, 95 and 96? 95, 96. That's in the purpose and need statement of the environmental assessment. And really throughout the environmental assessment are references to the need to provide LNG tankers access to the harbor. For example, at JA191... But that's not liquid natural gas because there had already been tankers accessing the harbor. There had been diesel tankers accessing the harbor, but LNG tankers are... This doesn't say LNG tankers. 95, 96. I believe at the top of 96, it specifically says LNG tankers. Yeah, it will allow liquid natural gas tankers. But that doesn't mean that's the purpose of the project. Well, it's in the purpose and need statement of the project, the need to provide these tankers access to the harbor. And furthermore, it also recognizes that LNG development at JA191 is a reasonable future assumption if the dredging project occurs. And now, however, characterized underneath as a connected action or as a reasonably foreseeable cumulative or indirect impact, the Corps here was required to look at those anticipated impacts. If the president wanted to issue an order prohibiting new LNG terminals, could he do that? Your Honor, I don't know. I hesitate to weigh into that. I ask because I wonder how speculative this LNG project is. It seems like it needs local Puerto Rican, local Puerto Rico approval. It would need FERC approval, may need some other approvals as well. And it's just not clear to me that it will ever happen or happen anytime soon. Your Honor, the standard under which an agency must evaluate cumulative impacts is whether or not they are reasonably foreseeable. And here, the development of LNG is a reasonably foreseeable result of this project. Should we be looking at the general development of LNG or the actual conversion of the two facilities? I think we should look at whatever is reasonably foreseeable. And here, the two facilities is clearly envisioned in the environmental assessment. The location of those facilities are located on the map. They're specifically called out on the map in the environmental assessment at JA 197. So they knew the precise location where those LNG developments would be. But then I guess in the record, it says that that Puerto Rican utility was bankrupt and there's a move to privatize it. And there were other priorities because of the two hurricanes. At what point does it just become speculative? I think this court in Eagle County found that the agency must engage in reasonable forecasting. And here, they have clearly stated in the environmental assessment that it's a reasonable future assumption that LNG development will happen. That's the general LNG development, not the specific conversion of these two facilities. That seems quite speculative. Well, I mean, Judge Walker alluded to the fact that there might not be that exact development. It's speculative. But New Fortress, which is really outside of the scope of this record, has already been developed. And while the vast majority of LNG tankers in the world's fleet cannot access the harbor absent this dredging project, they are anticipating the dredging project in order to... Because right now, what they're doing is they're unloading their LNG on a floating vessel and then using smaller ships to ferry it. And I think as this court is aware, they have entirely escaped NEPA review of that project because they illegally converted the facility without FERC approval. So I think that it is... LNG development as a whole is reasonably foreseeable, but also these specific locations and these specific developments are reasonably foreseeable. In our opening brief at pages 13 through 15, we cite where the environmental assessment specifically notes that connection between the two actions. And also, we note in our opening brief that the Puerto Rican power authority repeatedly highlights that channel widening would be necessary to reliably receive LNG vessels in San Juan Harbor. That's at JA 155. And furthermore, the Army Corps evaluated the economic benefits of LNG development and they should have also, you know, analyzed the impacts of LNG development if they were going to look at the benefits. Can you address whether you forfeited your arguments about LNG by not raising that before the agency, the environmental effects? Sure. Your Honor, we consistently raised in our comments the need to evaluate all cumulative and indirect effects of the project. And the burden is not on plaintiffs to identify cumulative impacts, but it's on the Corps. I'd point the Court to the Ninth Circuit decision, Tamoac Tribe, which found that in order for plaintiffs to demonstrate that the agency failed to conduct a sufficient cumulative impact analysis, they need not show what cumulative impacts would occur. And at JA 445, we consistently raise a cumulative impacts argument in our comments to the agency. But you didn't alert the agency. That you were concerned about the environmental effects of the LNG conversion. Your Honor, Ruth Santiago, one of the members of the appellant organizations, did put the Corps on notice by providing documents regarding LNG after a public hearing. And we believe that is sufficient to put the Corps on notice. That was a different LNG project, though. Are you talking about documents attached to an email? Yes. That was a different LNG project. That was off the southern coast of Puerto Rico. Since it's unrelated to what was happening with this project. Correct, Your Honor. Well, I would point the Court to the Supreme Court's opinion in Public Citizen, which said that a NEPA document's flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge proposed action. And here, for the connected actions because we did not raise that in our comments, Your Honor. For the cumulative and indirect impacts, we did raise those in our comments. Not of LNG specifically, but the need to evaluate all cumulative and indirect impacts. I guess, though, just saying generally, you have to evaluate cumulative and indirect effects. That's just a legal standard. Like, you have to put the agency on notice that you're concerned about the environmental effects of LNG. Like, you can't preserve this specific argument by saying generally, you have to consider cumulative and indirect impacts. Well, again, I'd point, Your Honor, to the TAMOAC decision in the Ninth Circuit. That's the burden is on the agency to identify those cumulative impacts and not on the plaintiffs. And we did raise the issue of cumulative impacts in our comments. Judge Rodgers, do you have any questions? Oh, not at this point. Thank you. Thank you. Thank you very much. We'll give you a couple minutes in rebuttal. Good morning, Mr. McArdle. Good morning. Kevin McArdle on behalf of the federal appellate as it may have pleased the court. Starting with the jurisdictional issue, we're in a situation where if the joint, the corrected joint stipulation doesn't suffice to address the court's jurisdictional concerns, plaintiff's notice of appeal would certainly ripen under Rule 482 and this court's precedent upon entry of final judgment. And I direct the court's attention in particular to capital sprinkler inspection, the guest services, 620 F 3rd 217 and the outlaw case cited there. So the parties promptly took steps to secure the entry of final judgment and consistent with the policies under Rule 482, we propose that if the court believes that there's any doubt about whether the joint stipulation, the corrected stip solves the issue, the court should just defer consideration of the merits until the district court rules on the joint motion. Now, there may be some issues under Rule 41 as Judge Walker suggested, but I don't think that there are because there was only two remaining claims after the summary judgment ruling and the stipulation dismissed the entirety of the remainder of the action. Well, it would dismiss remainder of the action, which seems to me very different than dismissing the action. Well, it's not a situation where the parties are trying to just get portion dismissed while the rest proceeds, right? I just to put my cards on the table. I have mixed feelings about the theory that I floated with your opposing counsel, because on the one hand, I think it's probably what the text of Rule 41 requires. And I do think it's not as impractical as it sounds, because I think in all these cases where parties are doing a joint stipulation of dismissal without prejudice or with prejudice in the hopes of readying the remainder of the case for an appeal, they have several other options that are not in violation of the text of the rule. One would be an amended complaint. One would be for the district court under 41B to issue an order for failure to prosecute. Then that order could be consistent with a motion from the defendant that's unopposed by the plaintiff. The plaintiff has abandoned the remaining claims. Judge Nichols here asked for a status report. I think probably if the status report had made clear, it's unclear to me why you all didn't respond when he asked for the status report, but if the status report had made clear that the remaining claims were being abandoned, I think he probably had inherent district court authority to dismiss for lack of prosecution. And then I also think probably under Rule 54B, you could have just asked him to certify that the seven claims where he had ruled on summary judgment were good for appeal, should be appealed. I think all those are just about as practical as what often happens, which is just a joint stipulation to dismiss the remaining claims. They're all consistent with the rules of federal procedure, and it seems like what often happens is not consistent with the rules of civil procedure because Rule 41A refers to dismissing action, not dismissing claims within an action. Having said that, here's why I'm on the fence. Yes, we've been doing it this way for a really long time, and there's strong dicta saying that it's okay. So I'm not saying who's right, which side of this is right, but I welcome your thoughts in helping me think through this. Well, I agree that there are other options, but they're still on the table. The judge asked for a supplemental brief by the 31st, and we can most definitely put in that brief that if the court has concerns about the applicability of Rule 41, plaintiffs move to dismiss the remaining claims, which they acknowledge were forfeited from the complaint. So that would suffice, and the parties could also stipulate the entry of summary judgment on those claims because, as counsel pointed out, that was the intent. The parties moved. They filed cross motions for summary judgment. We saw it in ECF 22, dismissal of the complaint with prejudice. So it was incumbent at that point if plaintiffs wanted to preserve Claims 389 to raise them in response to our motion. They didn't. The court granted our motion, and it would have been perfectly appropriate to enter final judgment at that point. Now we are where we are. So if we hold this case essentially in abeyance until Judge Nichols rules, what if he rules that he doesn't have jurisdiction? Then I think the court would have to make a decision about whether the corrected stip itself cures the issue. What if we don't think it does? If you don't think it does, if you think the entry of judgment is required and he doesn't enter judgment, I think you could potentially retain the case but issue a limited remand for him to enter judgment, or you'd have to dismiss the appeal. There is one point I want to raise, though. I mean, we agree that it's not entirely clear whether under Robinson Reader, whether a stipulation of dismissal with prejudice at this point would trigger the applicability of Rule 482, but that's not the only potential avenue, as I think Judge Rogers was alluding to. There's also the doctrine of cumulative finality, and there's an issue outstanding about whether that doctrine survives the amendment of Rule 482 in 1979 or whether it could supplement Rule 482, and I will say... The cumulative finality has not been briefed, and I hesitate to suggest we order more briefing when Judge Nichols has ordered more briefing on jurisdiction, but that hasn't been briefed, and so I'm just not... Well, none of these jurisdictional issues... What would happen if this happened? We dismiss for lack of appellate jurisdiction, and among the things that you do in the district court in response to Judge Nichols' order is under Rule 41B, you move to dismiss the two remaining claims. Presumably, El Puente would not oppose that, and then Judge Nichols issues an order under Rule 41B, not Rule 41A, because Rule 41A refers to an action. Rule 41B refers to the action or any claim, so then under Rule 41B, Judge Nichols dismisses the remaining claims, and then you have a... That's appealable to us. There are definitely options if you... But I guess the point is, I don't think dismissal of the appeal would be consistent with the purpose of Rule 41A. You know, as the Supreme Court said in the first tier case, the purpose is that the technical defect of prematurity should not be allowed to extinguish an otherwise proper appeal, and that's what we would have once the court enters judgment. I mean, that's all that's outstanding and left to be done. There's no risk here of piecemeal appeals. There's no good policy reason to dismiss, and all that would engender is additional time and commitment of resources. And I know we didn't... Nobody briefed cumulative finality, but I think the court should be aware of it. And the Fourth Circuit, at least, relied on that doctrine in holding that a stipulation entered by the parties was sufficient after notice of appeal was filed to achieve finality, and that's 912 F. 3rd 154. And although this court hasn't squarely addressed the interplay between Rule 482 and cumulative finality, it has applied that doctrine to find finality in slightly different circumstances, and that's in the Building Industry Association versus Norton 247 F. 3rd 1241. So I think another reason not to dismiss is I think the court would have to address whether the corrected stipulation suffices either under Rule 482 or under cumulative finality before dismissing, and we can avoid that simply by waiting for the judge to enter judgment, even if it means in our supplemental brief we have to propose other options than Rule 41. So that seems to us to be the avenue that's most consistent with the policies underlying Rule 482 and with notions of judicial economy and with the intent of the parties when they cross moved for summary judgment. Unless my colleagues have further questions on this issue, perhaps you could turn to the mayors. Sure. I'm on the issues of whether the core adequately considered the environmental impacts of LNG. That issue was forfeited because the plaintiffs didn't raise it during the administrative process, either in their comments during the scoping period or in their comments on the EA. And the case law is clear. It's a general principle administrative law that a party has to written. This is from the Center for Sustainable Economy case site in the briefing. Party has to raise an issue with sufficient precision, clarity and emphasis to give the agency a fair opportunity to address it in order to preserve that issue for judicial review. And that clearly didn't happen here, either in plaintiff's comments or in Ruth Santiago's statements at the public hearing, which had nothing to do with LNG or in the bulk submission of materials related to another facility on the south side of Puerto Rico. It certainly wasn't so obvious that the court should be doing a comprehensive analysis of an LNG project that it was not proposing to approve. So that doctrine, even if it applies at all in DC Circuit, doesn't apply in this case. Well, let me ask you. In an EPA case that went to the Supreme Court, where Justice Ginsburg wrote the opinion to the court, this circuit had cited its own precedent about sufficient specificity. And basically the Supreme Court said, yes, that is our principle, but everybody knew what was going on. That's not a basis for saying that there was a forfeiture here. And the court did look at the LNG issue in a number of different ways, the economic benefits, et cetera. So it's not as though the challenge here, or is it such a surprise, either to the court or the government, given that this project is not being developed for tourism and local summers. And indeed, in response to Judge Pan's question, counsel for appellate cited some statements of purposes. What's your response there? Yes, Judge Rogers. That certainly at the onset, one of the objectives of this project was to facilitate the ability of large standard LNG tankers to reach this terminal that the authority, the Puerto Rico Electric Power Authority was envisioning. But that's not the end of the story. As time went on, it became unclear if the authority had the wherewithal and means to pursue this plan, which would involve construction of a $350 million terminal and require both FERCs and local approval. And so the court specifically analyzed that issue in light of the uncertainty and said, look, we need to look at whether this project is going to be justified under either scenario, because we don't know, and it's uncertain if Puerto Rico is going to go forward with it. And they looked at that and said, this project is fully justified either way because of the transportation cost savings that would ensue and because it will address longstanding navigational constraints in San Juan Harbor and facilitate the safe and efficient transit of petroleum tankers, cruise ships and other vessels. So at that point, having made that determination, it no longer makes sense to say that, well, this project was designed to facilitate LNG deliveries, and that's its only or even a primary purpose. It wasn't because it was fully justified regardless of what the authority chose to do. And in fact, the court noted that it was a load. What was you saying the LNG development was thoroughly justified regardless of the port project? No, no, no. The port project. That's quite the reverse. Yes. The port project was completely justified regardless of what the authority did regarding LNG. And in fact, the court described the authority's plan as a low consequence item from federal planning perspective, and that's at J191 and 286. So having said that, it doesn't make sense to state that this was actually a central purpose or a primary reason for this project. This project was fully justified economically and practically based on the transportation cost savings alone. And the efficiencies and increase in navigability. LNG projects are at this point in 2024, highly controversial. Is that fair to say? It seems to be the case. It seems to be the case. And there are, as I understand it, just to give one example,  There's been a lot of coverage, a lot of strong, vigorous environmental voices urging the Biden administration to not allow that to go forward. And as I understand it, I think one of the petitioners in this case is among them. And it seems that, you know, maybe that movement will succeed and maybe that movement will not succeed. The very uncertainty of whether that LNG terminal, which is much farther along in its proposal than the possible LNG terminal in the harbor in our case, the very fact that it, you know, may be canceled, and maybe all LNG terminals will be, you know, canceled for climate reasons, just suggests that it's very speculative whether this Puerto Rico terminal is ever going to get built. Well, it was speculative in 2018 when the Corps did its analysis for the reasons that were alluded to, the authorities bankruptcy, the hurricane issues, the cost, the fact that it was behind schedule, the fact that a private partner necessary to help fund and build the project hadn't been identified, the fact that there was no conceptual design, the fact that an application hadn't been submitted to FERC, and then it would take three years from the submission of an application to get approval. So yes, and then now it's even more uncertain. If you look at, there's a letter that we cited in our brief that plaintiffs submitted to the Corps in 2022 in connection with the development of the Supplemental Environmental Assessment, that's J1161 through 66, and they go on to state that there's no need for additional LNG, and that the Puerto Rico Energy Bureau hasn't approved the authorities plans to pursue additional infrastructure in the San Juan area. And of course, there's another facility out there now that doesn't require any dredging, that's, and that's applied to FERC for approval to continue its current operations, which don't need dredging. And that facility is not even in a position to accept deliveries from standard LNG tankers because it doesn't have any storage capacity, which was an issue in the FERC proceeding cited in our brief, the decision there. So yes, it was uncertain in 2018, and it's even more uncertain now five years later. And for that reason as well, the purported environmental effects of constructing and operating this terminal weren't reasonably foreseeable at the time. And I think that follows most emphatically from the Theodore Roosevelt case cited in our briefing. There, the court said, even though the agency had prepared notices of intent under NEPA to prepare an EIS for other actions requiring federal approval, that in and of itself didn't render the effects of those actions reasonably foreseeable because it was just a notice of intent and there wasn't a concrete proposal associated with it. Here, we didn't even have anything close to a notice of intent. So since reasonable foreseeability is an element of both cumulative impacts and indirect effects under NEPA, on that basis alone, the effects of whatever the authority may construct hypothetically down the road are not indirect effects or cumulative effects of the dredging project. Thanks, Mr. Mercado. Let me double check. Judge Rogers, any questions? Yeah, I have a question. And I gather your last answer just indicates why not raising it was a wise decision before the Corps back in 2018. But in any event, moving along, the challenges to the failure in the cumulative impacts analysis that what our cases have required is far more than what's done here where the Corps simply listed products but didn't say how it examined them and what processes it used, what tests, et cetera. What's your response there? Well, I would point again to Theodore Roosevelt and where that case said that the effects of a project was that required federal approval and that was only the subject of a notice of intent to prepare an EIS don't qualify as reasonably foreseeable as required under the definition of cumulative impacts. That logic applies equally here. But the Corps acknowledged that certain resources would be affected. So we're beyond the Theodore Roosevelt case. And the question is, the Corps says here are the resources that would be affected, but we don't think there's going to be any significant impact. Well, the problem we pointed out in previous cases is, well, how did you reach that decision? Well, I guess I would respond... It's not a conclusion, it's the point. Well, the Corps did not completely ignore the potential effects of the authorities transition to LNG. For example, it analyzed... No, I'm beyond the LNG, all right? I'm into where the Corps said, look, there's resources, but we've decided that... Cumulative impact is not very significant. And the only question is, how did they reach that conclusion? And it's not a question whether the conclusion is right or wrong, but by what methodology? At least our cases have said, it's not enough to give us a conclusion or to give a challenging party who are standing a conclusion. You're supposed to spell out and explain what tests you use, et cetera. Dr. Council, you're familiar with those cases. Yes, I am. And I apologize for misunderstanding your question initially. Well, I think what we pointed out in the brief and which is supported by the record is that the analysis that the Corps did was commensurate with the predicted impacts of this project. In order to give rise to cumulative impacts, the project itself has to have at least some measurable adverse impact. And the Corps here determined that the adverse impacts, and I think this is on GA80 and 226, would be largely limited to temporary adverse impacts relating to water quality in the vicinity of the dredging areas. So if that's the scope of potential measurable adverse impacts from the project, the only means of other projects contributing related effects that we could aggregate would be if there are concurrent other projects that could also affect water quality in the same area. That's the only way those... So I understand. Here, the Corps itself decided its one-mile radius was not the proper radius. So it said, no, we should have done a five-mile analysis. So now we're talking about cumulative impact in a different context. And predominating the issue as to whether or not all of these subsequent actions can show compliance with NEPA, I'm just trying to understand even under the one-mile radius where all the agency says, and it may be perfectly correct conclusion, but it can't just, we have said, say the conclusion without saying how it got there. Well, the one-mile, five-mile issue pertains to the environmental justice analysis. And there... No, I understand. Sorry. Obviously, a five-mile radius brings in a lot more potential connected actions than what a one-mile radius brings in. Well, the purpose of the expansion of the analysis area for purposes of the environmental justice analysis was to capture some additional communities with environmental justice concerns that the plaintiffs and others had identified in comments. So, but the Corps' reasoning for why there would be no disproportionately high adverse impacts on communities with environmental justice concerns is laid out in the initial EA at 226, I believe. And it applies equally, regardless of whether the area for purposes of the analysis is one mile or five miles from the harbor. And that, again, it's because of the nature, the limited nature of the potential adverse impacts of this project. If they're going to be limited to temporary adverse effects on water quality in the vicinity of the dredging, which is what the Corps found, then there's no serious potential for communities with environmental justice concerns to be disproportionately adversely affected, except perhaps through effects on subsistence fishing. But the Corps also addressed that and said that the effects wouldn't be significant. So I think we would strenuously disagree with the suggestion that there was no substantive analysis explaining why there would be no disproportionate high adverse impacts in the EA. I think that's just not correct. I have one more question on the jurisdictional issue. You had suggested a limited remand. Can we do a limited remand if we don't have jurisdiction? I think the better option in light of that very concern is to defer consideration of the appeal until I understand the concern. For consideration until Judge Nichols acts? Correct. But he may not act because he thinks he doesn't have jurisdiction. Well, he certainly has jurisdiction, in my view, because if he didn't, then Rule 32 could never operate. If a district court lacked jurisdiction to subsequently enter final judgment after a premature notice of appeal had been filed, then that rule never applies because it's triggered by the subsequent entry of judgment. And of course, in both the outlaw and the capital sprinklers cases, that's exactly what happened. There was a subsequent court order that triggered the operation of 4A2, and there was no suggestion that the district court... Maybe this is totally fine. He can dispose of unresolved claims after the notice of appeal in the case has been filed? There are two options. The notice of appeal was effective and transferred jurisdiction to this court, in which case the court had jurisdiction, or it didn't. Right. In the first option, if Judge Nichols believes he's operating in that first option, then he may be hesitant to do anything. Well, in his order, he said that he didn't construe the summary judgment ruling as a final order terminating the case. So he's clearly, I think... I mean, I don't want to... It seems that he understands that he's in a position where the notice of appeal was ineffective, in which case he's not divested of any jurisdiction. Oh, go ahead. I think this... Beyond this question, but to the extent you think that the case was final in the district court, when did it become final? I think it became final on entry of that summary judgment ruling, granting our motion for summary judgment that sought dismissal of the complaint with prejudice. There was no harsh motion for summary judgment. The parties sought summary judgment of all claims. Plaintiffs didn't raise two claims, but the legal consequences, those claims were forfeited. Not that the order didn't resolve... It's contradicted by the record in which there were these two other accounts of the court, like asked you for a status. Well, look, if the court entered... Yes, you're right. It's counterfactual, but what I perceive possibly happening, which puts us in a weird position, is we have a disagreement with Judge Nichols. He thinks the stipulation was enough to give us jurisdiction. We think we can't act until he enters judgment on something. And then where are we? We're in a no man's land of jurisdiction. Well, consistent with the policies of Rule 4A2, it makes sense to at least allow for a little bit of time. The court could issue a minute order or an order stating that it was deferring ruling until a particular date to give the judge a chance to act. And then if he doesn't act, the court does what it needs to do. But at least in that instance, we'd provide an opportunity for Rule 4A2 to apply. Counsel, you may be aware of cases, and I think they basically involve some attorney fee cases where this court did issue an order of a limited remand for purposes of perfecting jurisdiction. Are you familiar with those cases? I'm familiar. It was a remand. So the district court said, well, an appeal has been filed, so I am divested of jurisdiction. So we issued an order saying, we're going to send it back to you for the purpose of you're entering this order, granting or denying attorney fees or something like that. So that Judge Pan's suggestion, I mean, falls within arguably that category. I mean, courts have done all kinds of things. So if Judge Nichols just says, well, the appeal has been filed, and I don't have jurisdiction, presumably these issues will be briefed before him. There are these limited remands. Yes, I mean, I'm not familiar, Your Honor, with the cases specifically that you mentioned, but the concept, I was informed of the concept of a limited remand, and it's been done before. I think Judge Pan's question is legitimate, and I don't have a compelling answer. To the extent that we find ourselves in a place of some uncertainty that may or may not require us or Judge Nichols to be creative or jump through some hoops, could all this have been avoided if you and the opposing parties had just followed the plain text of Rule 41? And dismissed the action? Is that what you're... No. So under Rule 41B, you could have moved to dismiss the remaining two claims, and they could have consented to that motion, and the district court could have entered an order dismissing those two claims with prejudice. Yes, if we had done that or if we had put the words with prejudice in the initial stipulation. I'm not sure that would have done it, but we'll... Before the notice of appeal was filed? I think under Rule 41A... Oh, okay. Whether you do it with prejudice, purport to do it with prejudice or without prejudice, it speaks only of dismissing an entire action, not of dismissing some claims within an action. Yes, and I think that would have sufficed. Okay. Unless the court has any questions. If it reaches the merits, it should affirm the district courtship. Thank you, Mr. Clark. We'll give you a couple minutes Ms. Jeffers. Thank you, Your Honors. A brief note on forfeiture, and then I'd like to address corals briefly again. So allowing... Regarding the claims that we forfeited our LNG claims in the NEPA process, allowing LNG takers access to the port was in the purpose and need statement of the assessment, as I already mentioned, and it should have been clear, especially given the fact that they weighed the environmental... The economic benefits of LNG, that there was no need to specifically point out this LNG development to the core. And in fact, it... But don't you have to respond to the argument that at that point, the notion that this LNG development was in any way going forward in connection with what was a port dredging was just too speculative under Theodore Roosevelt. Yes, I think that... Somebody had to be very specific and say, we're challenging it so that the core could respond. That's all I thought counsel was saying. Well, the LNG need not be certain to occur to require the core to evaluate its impacts. It only need be... No question. ...reasonably foreseeable, and the Puerto Rico Electric Power Authority conveyed its intent to the core during the preparation of the environmental assessment that the envisioned LNG terminal would require the dredging. And that's at JA301 and 977 through 986. So they were on notice at the time they prepared the environmental assessment that the Puerto Rico Power Authority was moving forward with this LNG development in the harbor. And regarding corals, Your Honor, I'd like to briefly note that the fishery services finding that the dredging project would have insignificant impacts to corals, avoiding the preparation of a full biological opinion was arbitrary and capricious. The service not only underestimated the harms of dredging to threaten corals, but their mitigation plan is insufficient to rectify those harms. First, the fishery services determination that the project is not likely to adversely affect threatened corals is unsupported by the record, which demonstrates that impacts to corals extend well beyond the 150 meter zone of impacts analyzed by the service. The dredging project in Miami showed that impacts, in that case, impacts to coral extended up to a mile from the site of the dredging itself and resulted in the deaths of almost a million coral. And the service's post hoc justification for why this project is different than Miami is not properly before the court, but even if it was, it doesn't rationally account for the differences in Miami or the fact... Sorry, Judge Walker, do you have a question? I was just going to suggest if you can please wrap up quickly, in part because I think that this topic was probably not discussed in your opening arguments or by opposing counsel. Let's end this room. Yes, Your Honor. Well, in conclusion, Your Honors, there are fatal flaws in both the NEPA and ESA analyses here. Dredging in San Juan Bay, as far as we know, is set to begin in five days on January 30th, and we request that while the court considers this case, if it is inclined to rule for appellants, that the court issue an order in joining dredging pending issuance of its decision. Thank you. Thank you, Ms. Jeffers. Thank you. Case is submitted.
judges: Walker, Pan, Rogers